# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:10-CR-217 |
| | ) | |
| UNITED WATER ENVIRONMENTAL | ) | |
| SERVICES INC., | ) | |
| DWAIN L. BOWIE, and | ) | |
| GREGORY A. CIACCIO, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on Defendants' Motion To Dismiss the Indictment, filed on April 14, 2011. For the reasons set forth below, the motion is **DENIED.**

<u>BACKGROUND</u>

Defendants, United Water Services, Inc. ("United Water")[1], Dwain L. Bowie ("Bowie"), and Gregory A. Ciaccio ("Ciaccio") are charged in a 26-count Indictment with violations of 18 U.S.C. section 371, 33 U.S.C. section 1319(c)(4) and 18 U.S.C. section 2. Count 1 of the Indictment charges Defendants with conspiring to "knowingly tamper with a monitoring method required to be

---

[1]United Water Services Inc. has ceased to exist. United Water Environmental Services, Inc. is its successor.

maintained by the Clean Water Act, in violation of the Clean Water Act, 33 U.S.C. § 1319(c)(4)" and also conspiring "[t]o defraud the United States Government, that is, to hamper, hinder, impede, impair, and obstruct by craft, treachery, deceit, and dishonest means the lawful and legitimate functions of the U.S. EPA in administering and enforcing federal laws and regulations." (Indictment ¶¶ 19-20). Count 1 of the Indictment alleges that the manner and means in which this was carried out included the following:

> Devising, executing, and attempting to execute a scheme to decrease the quantity of chlorine used in the treatment process during the disinfection season at GSD, by increasing the amount of chlorine used when the daily *E. coli* sample was taken, and then reducing the amount used after the sample had been taken [and] [d]evising, executing and attempting to execute a scheme to take samples of monitored discharges when there were elevated levels of chlorine by temporarily increasing the concentration of chlorine when the daily *E. coli* sample was to be taken, and then reducing the concentration after the sample had been taken.

(Indictment ¶¶ 21-22). In other words, the Indictment alleges that Defendants conspired to "tamper" with the required *E. coli* monitoring method by changing the levels of chlorine administered at the plant before and after taking samples for *E. coli*.

The remaining counts of the Indictment allege that Defendants[2] engaged in 25 separate instances of tampering with a monitoring

---

[2]All but one of these counts names all three Defendants. Count 2 names only United Water and Bowie.

method in violation of 33 U.S.C. section 1319(c)(4) and 18 U.S.C. section 2. Counts 2 through 26 of the Indictment charge Defendants with "knowingly tampering with a monitoring method required to be maintained under the Clean Water Act, by temporarily increasing the concentration of chlorine before taking *E. coli* compliance samples, and then decreasing it shortly after."

Defendants argue that, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), the Indictment must be dismissed because it alleges facts that do not violate federal law. According to Defendants, even if you accept the allegations in the Indictment as true, those allegations do not constitute tampering in violation of the Clean Water Act ("CWA"), and allowing the prosecution to proceed against Defendants would violate the rule of lenity. The Government has filed a response memorandum, and Defendants have filed a reply memorandum. In addition, the Government filed a supplement. Oral argument on the instant motion was held at Defendants' request on July 12, 2011. Following oral argument, additional memoranda were filed by the parties. The instant motion is now fully briefed and ripe for adjudication.


DISCUSSION

Motion to Dismiss Criminal Indictment

Under Federal Rule of Criminal Procedure 7(c)(1), an indictment shall "be a plain, concise and definite written

statement of the essential facts constituting the offense charged
. . .." A grand jury indictment serves to protect rights granted
by the Fifth Amendment, namely limiting the federal government's
power to hold someone to answer for a felony unless on a grand jury
indictment, and the Sixth Amendment, which grants persons accused
of a crime the right to be informed of the nature and cause of the
accusation. *See Russell v. United States*, 369 U.S. 749, 760-61
(1962); *United States v. Glecier*, 923 F.2d 496, 499 (7th Cir.
1991). "An indictment is constitutionally sufficient and satisfies
Fed. R. Crim. P. 7(c)(1) if it states the elements of the crime
charged, informs the defendant of the nature of the charge so he
may prepare a defense, and enables the defendant to plead the
judgment as a bar against future prosecutions for the same offense.
*United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir. 1997); *see
also United States v. Allender*, 62 F.3d 909, 914 (7th Cir. 1995).
An exhaustive recounting of the facts surrounding the crime is not
required. *Agostino*, 132 F.3d at 1189. Indeed, even the words of
the statute itself will suffice as long as those words expressly
set forth all the elements necessary to constitute the offense.
*Id.*

However, it is also true that an indictment "must be tested by
its sufficiency to charge an offense." *United States v. Sampson*,
371 U.S. 75, 78-79 (1962). The Seventh Circuit noted, in *United
States v. Gimble*, that:

> In order to be valid, an indictment must
> allege that the defendant performed acts
> which, if proven, constituted a violation of
> the law that he or she is charged with
> violating. If the acts alleged in the
> indictment did not constitute a violation of
> the law that the defendant has been charged
> with violating, we must reverse any subsequent
> conviction based on that indictment.

*United States v. Gimble*, 830 F.2d 621, 624 (7th Cir. 1987).

In considering Defendants' motion, this Court is mindful that dismissing an indictment is an extraordinary measure. *See e.g., United States v. Morrison*, 449 U.S. 361, 365 (1981) (concluding the dismissal of an indictment was unwarranted absent a constitutional violation that substantially prejudiced defendant's case); *United States v. Stokes*, 124 F.3d 39, 44 (1st Cir. 1997) ("Because the public maintains an abiding interest in the administration of criminal justice, dismissing an indictment is an extraordinary step.").

Facts

Under the CWA, pollutants may be discharged into the Nation's waters if the discharge is in compliance with the terms and conditions of a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. §§ 1311(a) and 1342. According to the Indictment, the Indiana Department of Environmental Management ("IDEM") issued a NPDES permit to the Gary Sanitary District ("GSD") in both 1994 and 2006. (Indictment ¶

14). Under those permits, GSD was permitted to discharge treated effluent from its wastewater treatment plant ("plant") into the Grand Calumet River, subject to effluent limitations, and so long as the monitoring methods in the permits were complied with.

The only pollutant governed by the permit that is at issue here is *Escherichia coli* ("*E. coli*"). The permits allowed GSD to discharge effluent that included no more than 235 *E. coli* colonies per 100 milliliters of water. (2006 Permit at 3; 1994 Permit at 3). These limitations on the emission of *E. coli* were only in effect for seven months out of the year, April 1 through October 31. (Indictment ¶ 15). In order to comply with these emission limitations, GSD was required to disinfect its effluent, "on a continuous basis such that violations of the applicable bacteriological limitations for *E. coli* do not occur from April 1 through October 31, annually." (2006 Permit at 4). The 1994 permit contained similar language. (1994 Permit at 5). No specific method of disinfection was required by the permits. Chlorine is one method of disinfection utilized by wastewater treatment plants, but the permits do not specify how much chlorine needs to be used if that method of disinfection is chosen.

As for monitoring, the permits required that, for *E. coli*, a single "grab" sample must be taken each day and tested to determine the *E. coli* concentration. The permits do not dictate at what time the grab samples must be taken. "Grab" samples are defined as

"individual samples collected over a period not exceeding 15 minutes and that are representative of conditions at the time the sample is collected." U.S. EPA NPDES Permit Writers' Manual at 8.1.4.1 (Sept. 2010).[3] The results of the "grab" samples were to be recorded and reported on a monthly report filed with IDEM, and the records were to be maintained for a minimum of three years. The 2006 permit requires that all samples must be "representative of the volume and nature of the monitored discharge flow and shall be taken at times which reflect the full range and concentration of effluent parameters normally expected to be present." (Indictment ¶ 14(D); 2006 Permit ¶ 14). The 2004 permit contains similar language. (1994 Permit ¶ 14). The 2006 permit also requires that samples "not be taken at times to avoid showing elevated levels of any parameters." (Indictment ¶ 14(E); 2006 Permit ¶ 14).[4]

According to the Indictment GSD, like many publically owned treatment works ("POTW's"), entered into a long-term contract with United Water, under which United Water agreed to operate and maintain GSD's treatment plant. (Indictment ¶ 1). Bowie was United Water's Project Manager for the GSD plant, and the highest-

_____

[3]The glossary to the Permit Writers' Manual defines "grab sample" slightly differently: "[a] sample taken from a wastestream on a one-time basis without consideration of the flow rate of the wastestream and without consideration of time." U.S. EPA NPDES Permit Writers' Manual at Ex. A-2 (Sept. 2010). For purposes of this motion, the slightly different definitions are not of consequence.

[4]The 2004 permit does not include this language.

ranking United Water employee at the plant.  (Indictment ¶ 2).

Ciaccio was United Water's Plant Superintendent or Operations

Manager at the plant, and the second highest ranking United Water

employee at the plant.  (Indictment ¶ 3).

Defendants argue that "because, as the parties agree, it is

not a crime to raise the level of chlorine added to the effluent

and it is not a crime to take a grab sample, it cannot be a crime

to raise the chlorine before taking the sample and lower it

afterward *unless it is alleged that the conduct was undertaken with*

*consciousness of wrongdoing, in furtherance of, or to conceal other*

*violations.*" (Defendants' Reply in Support of Their Motion to

Dismiss the Indictment at 2).  According to Defendants, the

Indictment is insufficient because it alleges acts that in and of

themselves are legal and does not also allege something more;

namely, that the conduct was undertaken with consciousness of

wrongdoing, in furtherance of, or to conceal other violations.

Defendants further argue that the rule of lenity applies and any

doubt regarding whether the Indictment sufficiently states an

offense must be resolved in favor of the Defendants.

This Court's analysis begins with considering the elements of

a violation of the CWA's tampering provision.  Next, this Court

addresses Defendants' argument that the Indictment is insufficient

because it charges acts not in and of themselves illegal and does

not also allege either that the charged conduct was in furtherance

of, or to conceal other violations or that the charged conduct was undertaken with consciousness of wrongdoing. This entails looking closely at the meaning of the phrase "knowingly tamper" and consideration of the *mens rea* requirement for the CWA's tampering provision. Finally, the Court considers Defendants' argument that there is significant ambiguity surrounding the phrase "knowingly tamper with a monitoring method" that the rule of lenity ought to be applied in Defendants' favor.

<u>What are the elements of a CWA tampering violation?</u>

The tampering provision of the CWA provides that:

> [a]ny person who knowingly makes any false material statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this chapter or who knowingly falsifies, tampers with, or renders inaccurate any monitoring device or method required to be maintained under this chapter [commits a violation against the United States].

33 U.S.C. § 1319(c)(4). Accordingly, under the CWA, a tampering violation occurs where:

> (1) A person;
> (2) tampered with a monitoring method;
> (3) the method was required to be maintained under the CWA; and
> (4) the person acted knowingly.

33 U.S.C. § 1319(c)(4); *United States v. Panyard*, No. 2:07-CR-20037 (E.D. Mich.)(Gov. Ex. B; DE 41-2 at 29).

<u>Is something more required when the alleged acts are not in and of themselves illegal?</u>

Although Defendants suggest that the Indictment is insufficient because it does not allege "that the conduct was undertaken with consciousness of wrongdoing, in furtherance of, or to conceal other violations," the plain language of the CWA's tampering provision does not impose such requirements. Defendants have relied primarily on two cases in support of this assertion: *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), and *United States v. Chevron U.S.A., Inc.*, No. 09-CR-0132, 2009 WL 3645170 (W.D. La. Oct. 30, 2009). These cases are readily distinguishable from the case before this Court.

*Arthur Anderson* involved a charge that defendants "knowingly corruptly persuaded" a person to withhold testimony or destroy records to be used in official proceedings. The Court of Appeals for the Fifth Circuit found that the charge did not require that the jury find consciousness of wrongdoing, but the United States Supreme Court reversed. *Arthur Andersen*, 544 U.S. at 702. In reversing, the Court noted that:

> We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. Such restraint is particularly appropriate here, where the act underlying the conviction - "persuading" - is by itself innocuous.

*Id.* at 703 (internal citations and quotations omitted). The Court's decision turned on the meaning of the word corruptly, noting that the jury instructions given by the district court "diluted the meaning of 'corruptly' so that it covered innocent conduct." *Id.* at 706. Defendants derive from *Arthur Andersen* the following proposition: "An indictment charging . . . otherwise legal conduct must also allege that the conduct was undertaken with improper intent, in furtherance of or to conceal some illegal act." (Defendants' Reply in Support of Their Motion to Dismiss Indictment at 3). *Arthur Andersen*, however, does not stand for this general principal and Defendants offer no persuasive reason that this Court should expand the holding of *Arthur Andersen* to cover statutes that do not use the word "corruptly." Additionally, the instant case differs from *Arthur Andersen* in that the act underlying the charges against Defendants – "tampering" – is not innocuous, for reasons explained more fully below.

Defendants also rely on *Chevron* to support their claim that the conduct the Indictment alleges occurred was lawful, and therefore, Defendants cannot be held criminally liable without something more. *United States v. Chevron U.S.A., Inc.,* No. 09-CR-0132, 2009 WL 3645170 (W.D. La. Oct. 30, 2009). Chevron added a steel structure known as a caisson to a well head of an oil rig. The caisson was designed to protect the wellhead from damage due to contact with boats. The caisson caused the death of 35 brown

pelicans, a protected species. Chevron was charged with "taking" brown pelicans in violation of the Migratory Bird Treaty Act ("MBTA"). The Government contended that Chevron should be held criminally liable, arguing that the taking provision of the MBTA is a strict liability statute, but the district court in *Chevron* rejected that argument. The district court in *Chevron* noted that:

> [T]hese regulations were clearly not intended to apply to commercial ventures where, occasionally, protected species might be incidentally killed as a result of totally legal and permissible activities, as happened here.

*Chevron*, 2009 WL 3645170 at *3. Applying the rule of lenity, the district court found Chevron did not have fair warning that their actions might expose them to a federal criminal prosecution. *Id.*

> Did Chevron have "fair warning", by simply reading the "taking" regulation, that their uncovered caisson, which was required to protect the wellhead, exposed them to federal criminal prosecution if brown pelicans became trapped and died? The posing of the question supplies the answer: No. ....[T]he undersigned is at a loss to see how Chevron should have reasonably foreseen the danger to brown pelicans from these uncovered, perfectly legal, widely used caissons.

*Id.* at *4. The district court found the charge against Chevron to be analogous to charging someone with taking a protected bird when it flies into the windshield of their car. Accordingly, the district court rejected a tender of a guilty plea because the stipulated facts did not constitute a violation of the MBTA. *Id.* at *5.

*Chevron* is distinguishable from the instant case for several reasons. First, the district court in *Chevron* was not considering whether the indictment was sufficient, but whether the facts known to it provided a sufficient factual basis for acceptance of a plea of guilty. *Chevron* also involved a wholly different statute, the taking provision of the MBTA, which does not state any *mens rea* requirement at all, while the tampering provision of the CWA does include a *mens rea* requirement; namely, knowledge. Lastly, when one asks a similar question to that asked by the *Chevron* Court regarding the conduct alleged in the instant Indictment, "did Defendants have fair warning, by simply reading the tampering provision of the CWA, that the charged conduct exposed them to federal criminal prosecution?", the answer is not, as in *Chevron,* a resounding "no", for reasons set forth below.

This Court finds Defendants argument – that the Indictment must allege something more than the plain language of the statute requires – unpersuasive. The CWA does not require that Defendants emitted pollutants over the limit allowed by the permit or that any environmental harm occur. It does not require that the permit was violated. It also does not require that the tampering lead to sample results that are not representative. Rather, it appears from the plain language of the CWA's tampering provision that Congress intended to prevent tampering even in the absence of any other violation. Accordingly, this Court declines to impose a

requirement that the Indictment allege that Defendants' acts were in furtherance of, or to conceal other violations.

<u>Is consciousness of wrongdoing required for a violation of the tampering provision of the CWA, and is there sufficient ambiguity regarding the phrase "knowingly tamper" such that the rule of lenity ought to be applied in the Defendants' favor?</u>

Having determined that the Indictment need not allege that the acts were done in furtherance of, or to conceal other violations, this Court now considers whether the Indictment must allege, as Defendants argue, that the conduct was undertaken with consciousness of wrongdoing. This portion of Defendants' argument finds some support in the plain language of the statute; namely, the meaning of the phrase "knowingly tampered with a monitoring method." Defendants argue that this phrase, as applied to the facts of this case, is sufficiently ambiguous such that the rule of lenity ought to be applied.

The rule of lenity "insists that ambiguity in criminal legislation be read against the prosecutor, lest the judiciary create, in common-law fashion, offenses that have never received legislative approbation, and about which adequate notice has not been given to those who might be ensnared." *United States v. Thompson*, 484 F.3d 877, 881 (7th Cir. 2007). The Court has held that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *United States v. Bass*, 404

U.S. 336, 348 (1971).  However, the rule of lenity only applies
"when there are serious ambiguities in the text of a criminal
statute."  *United States v. Anderson*, 517 F.3d 953, 962 (7th Cir.
2008).  Whether the statute is ambiguous such that the rule of
lenity may be utilized turns on statutory interpretation.

Statutory interpretation begins with the plain language of the
statute.  *United States v. LaFaive*, 618 F.3d 613, 616 (7th Cir.
2010).  In considering the plain language of the statute, it is
proper to refer to "the language itself, the specific context in
which that language is used, and the broader context of the statute
as a whole."  *Id.* (citations and quotations omitted).  If the
statute contains an ambiguity, and the text or structure of the
statute cannot resolve that ambiguity, then it is proper to look to
legislative history.  *Id.*  Only then is the rule of lenity applied.
*Id.*

What is the meaning of "tampering?"

Neither the CWA nor the related regulations define
"tampering."  Accordingly, it is assumed that Congress intended to
utilize its ordinary meaning.  *See LaFaive*, 618 F.3d 616.  No
reported decision has attempted to define "tampering" as used in
the CWA, and therefore, this Court considers dictionary definitions
to determine the ordinary meaning of "tampering."

According to Black's Law Dictionary, to "tamper with" means
"1. To meddle so as to alter (a thing); esp., to make changes that

are illegal, corrupting, or perverting. 2. To interfere improperly; to meddle." Black's Law Dictionary 1592 (9th Ed. 2009). Webster's Third New International Dictionary offers a variety of definitions: (1) "to deal secretly: carry on underhand or improper negotiations: bring improper influence to bear"; (2) "to interfere so as to weaken or change for the worse - used with *with*"; (3) "to work secretly for some end ...to alter for an improper purpose or in an improper way." Webster's Third New International Dictionary 2336 (1971). Webster's New World Dictionary, College Edition defines tamper as "to contrive something secretly; plot; scheme." Webster's New World Dictionary, College Edition (1968). As to "tamper with," Webster's New World Dictionary's definition is "1. to make secret, illegal arrangements with; bribe. 2. to interfere with, meddle. 3. to change by meddling; make corrupt, illegal, etc." *Id.* Merriam-Webster's Dictionary of Law defines tamper as "1: to bring improper influence to bear (as by bribery or intimidation) - used with *with* <*tamper ed* with the jurors> 2: to alter or interfere in an unauthorized or improper manner - used with *with* <*tamper ed* with evidence>." Merriam-Webster's Dictionary of Law, http://www.dictionary.reference.com/browse/tamper (last visited August 9, 2011). Although many variations of the definition of tampering can be found, from each of these definitions it is clear that tampering is not an innocent event: as Defendants note, there is no such thing as innocently tampering.

"It is a fundamental cannon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *University of Chicago v. United States*, 547 F.3d 773, 777 (7th Cir. 2008). From the words of the statute itself, the purpose of the CWA tampering provision is clear: it is intended to prevent the corrupting of samples, and to ensure accurate, representative reporting. 33 U.S.C. § 1319(c)(4). Each of the many definitions cited above offers a general definition of tamper that is consistent with the aim of the statute: to meddle so as to alter, in an improper, corrupting manner.[5] References to carrying on underhand or improper negotiations and bribery are clearly not what was intended in this statute. Accordingly, it can not be said that there is significant ambiguity regarding the meaning of "tamper" in the CWA tampering provision.

Although the parties spend considerable time discussing the definition of "tamper," Defendants contention that statutory ambiguity exists does not turn so much on the definition of tamper, as on the scope of the conduct that might be included in the definition. In other words, Defendants argue that the ambiguity rests in the uncertainty regarding whether the charged conduct constitutes tampering. Accordingly, this Court must decide if the

---

[5]This definition is chosen for purposes of the instant order as it reflects that tampering is not innocent, but is not intended to suggest that this precise definition is what must be utilized at later stages of this case. The parties remain free to argue which precise definition should be utilized in any future motions or at trial.

charged conduct can be considered tampering.

<u>Is the charged conduct tampering?</u>

Temporarily increasing the concentration of chlorine before taking compliance samples and reducing it shortly thereafter will not always amount to tampering in violation of the CWA, but this Court believes that it can in some circumstances. This will depend on the precise facts surrounding the alleged acts. Raising the chlorine level, taking a grab sample and lowering it can be done in a way that is not fundamentally different than tampering with a monitoring method in other manners that are widely accepted as falling within the statute (i.e. placing chlorine into a sample after it is drawn).

The parties drew various analogies to drinking and driving at oral argument, and this Court finds those analogies helpful. Drinking is legal, and driving is legal, but drinking and driving is illegal when one's blood alcohol level exceeds the allowable limit. Raising the chlorine level is legal, taking a grab sample is legal, and lowering the chlorine level is legal; but, raising the chlorine level, taking the required grab sample and reducing the chlorine level, when done in sequence as alleged and in an improper or corrupting manner, may violate the CWA's tampering provision.

In so holding, this Court is not the first court to indicate that benign, legal acts can be performed in a manner that constitutes a violation of the CWA's tampering provision. *See*

*United States v. Panyard*, No. 07-CR-20037, 2009 WL 37377, at *5 (E.D. Mich. Jan. 7, 2009). In *Panyard*, the defendant was charged with directing employees of Comprehensive Environmental Solutions, Inc. ("CSSI") to dilute or replace the facility's wastewater discharge stream to give the impression of compliance with regulations, in violation of 22 U.S.C. section 1319(c)(4). Employees testified that they filled tanks with water from a fire hydrant, but the defendant claimed that those same tanks were filled with brine water, which is a legitimate waste stream that was allowed to be discharged under the permit. On a motion for judgment of acquittal, the defendants argued that there was "no obligation to discharge from a specific tank at any particular time; therefore, discharging brine water when Detroit Water and Sewerage Department ("DWSD") was monitoring the facility did not amount to falsifying the sampling device or rendering it inaccurate." The *Panyard* court stated as follows:

> Sufficient evidence was presented to support a finding that tanks 14 and 15 were filled with regular water from a fire hydrant, not with a legitimate alternative waste stream. Furthermore, even assuming that tanks 14 and 15 were filled with brine water, for the monitoring process to function properly, it is necessary that samples be representative of the facility's discharge. Therefore, a treatment facility may not deliberately alternate between waste streams to deceive government officials into believing it is complying with its permit. To hold otherwise would render § 1319(c)(4) effectively unenforceable, short of proving that a defendant physically tampered with a monitoring device. Finally, Defendant does not argue – and the evidence would not support

> the notion – that it was merely a matter of
> coincidence that CESI discharged from tanks 14
> and 15 when DWSD officials visited the site.

*Id.* at *5. Although *Panyard* is addressing a motion for judgment of acquittal rather than a motion to dismiss an indictment, the logic of the *Panyard* court is equally applicable to the allegations in the instant Indictment, and the Court finds its reasoning persuasive. The fact that the individual acts making up the offense conduct are not in and of themselves illegal does not render the indictment insufficient. The acts alleged in the indictment may support a finding that Defendants tampered in violation of the CWA. Furthermore, the statute is not ambiguous in this regard.

> Must the Indictment allege that Defendants knew not just what they did, but that it was tampering?

Defendants argue that "knowingly" modifies tamper, and that even if their acts amount to tampering, Defendants must not merely know what acts they have done, but must know that those acts amount to tampering. Presumably, Defendants believe that the Indictment must specifically allege that they knew their acts were tampering.

Although the Seventh Circuit has not addressed this question in the context of the CWA's tampering provision, the Court of Appeals for the Eighth Circuit has considered the question and held that the "knowing" required under this provision is a knowledge of one's actions, not a knowledge that those acts violate the law. In *United States v. Sinskey*, 119 F.3d 712 (8th Cir. 1997), a case involving manipulation of the timing of samples to correspond with

low levels of discharge, thus rendering the samples inaccurate, the Court thoroughly analyzed this question. The defendants in *Sinskey* argued that 33 U.S.C. section 1319(c)(4) requires proof that they knew that their acts were illegal. Defendants had made the same argument with regards to 33 U.S.C. section 1319(C)(2)(1), and the court rejected the argument. Noting that two other appellate courts, the Second and Ninth Circuits, had found "that 33 U.S.C. § 1319(c)(2)(A) does not require proof that the defendant knew that his or her acts violated the CWA or the NPDES permit", the Eighth Circuit reached the same conclusion. *Id.* at 716 (citing *United States v. Hopkins*, 53 F.3d 533, 441 (2nd Cir. 1995); *United States v. Weitzenhoff*, 35 F.3d 1275, 1283-86 (9th 1994)). Turning to section 1319(c)(4), the *Sinskey* Court noted that:

> [t]his argument has even less force with respect to § 1319(c)(4) - which penalizes a person who "knowingly falsifies, tampers with, or renders inaccurate any monitoring device or method required to be maintained by the CWA - than it does with respect to § 1319(c)(2)(A). In § 1319(c)(4), the adverb "knowingly" precedes and explicitly modifies the verbs that describe the activities that violate the act.
> We have repeatedly held that, in other statutes with similar language, the word "knowingly" refers only to knowledge of the relevant activities (in this case, the defendants' knowledge that they were rendering the monitoring methods inaccurate by aiding and abetting in the flow games and selective sampling). Based on this well established constructional convention, and the equally well known principle that a term that appears in a statute more than once should ordinarily be construed the same way each time, we see no reason to read a requirement that a defendant know of the illegal nature of his or her acts

into 33 U.S.C. § 1319(c)(4).

*Id.* at 717.

The Seventh Circuit Court of Appeals cited approvingly to *Sinskey* when the Court held in *United States v. Snook* that:

> To convict Snook for conspiring to violate the Clean Water Act, which, in relevant part, imposes criminal penalties for "[k]nowing violations," 33 U.S.C. § 1319(c)(2)(A), the government needed to prove only that Snook had knowledge of the underlying facts and not that he knew the conduct was illegal.

*United States v. Snook*, 366 F.3d 439, 443 (7th Cir. 2004).

This Court does not accept Defendants' suggestion that the Indictment must allege that Defendants knew their conduct constituted tampering, for such a requirement is tantamount to stating that Defendants must know their conduct violated the law. The CWA requires only that Defendants knew what they did; it does not require that Defendants knew that their acts met the legal definition of tampering. Accordingly, the Indictment need not specifically allege that the Defendants knew that their acts constituted tampering.

Is the rule of lenity applicable?

As discussed previously, the rule of lenity applies when there are serious ambiguities in the text of the criminal statute. Its purpose is to ensure that fair warning is given that certain acts may be prosecuted. Because the Indictment alleges Defendants tampered, it is alleging that Defendants engaged in the acts set

forth in the Indictment in a manner that is not innocent. Because
Defendants are not charged with increasing chlorine, taking a grab
sample, and decreasing chlorine for some legitimate purpose (i.e.
because the flow into the plant had increased), this Court finds
that the statute is not ambiguous with regards to whether the
charged conduct violates the law. A reasonable person would have
known that the acts alleged in the Indictment violate the CWA's
tampering provision. For the reasons set forth above, the CWA's
tampering provision does not suffer serious ambiguity, and the
statute at issue provides adequate notice that the acts alleged in
the Indictment might be criminally prosecuted. Accordingly, the
rule of lenity is not applicable.


CONCLUSION

The Indictment states the elements of the crime charged,
informs Defendants of the nature of the charges against them, and
enables Defendants to plead any judgment as a bar against future
prosecutions. In addition, the Indictment alleges that Defendants
performed acts which, if proven and shown to be performed with
sufficient *mens rea*, may constitute a violation of the CWA's
tampering provision. The Indictment is not legally deficient. To
the extent there are questions regarding whether the specific
conduct Defendants allegedly engaged in violated the CWA's
tampering provision, those questions turn on the specific facts of
this case, and are for the jury to decide. For the reasons set

forth above, Defendants' Motion To Dismiss the Indictment is

**DENIED.**

**DATED: August 24, 2011**                    **/s/RUDY LOZANO, Judge**
                                              **United States District Court**