**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　　　　　Plaintiff,　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　v.　　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　)　　NO. 2:10-CR-00217-PPS | |
| UNITED WATER ENVIRONMENTAL ) | |
| SERVICES INC., DWAIN L. BOWIE, ) | |
| and GREGORY A. CIACCIO,　　　) | |
| 　　　　　　　　　　　　　　　　) | |
| 　　　　　　　　Defendants.　　) | |
| _____) | |

## TRIAL BRIEF OF THE UNITED STATES

The United States respectfully submits this trial brief to inform the Court of the

general nature of this case and address certain legal and evidentiary issues that may arise

during trial of this matter, which is scheduled to commence on October 29, 2012. The

government estimates that it should take no more than two weeks to put in its case-in-

chief.

**I.　　THE INDICTMENT**

**A.  The Charges**

The Indictment charges United Water Environmental Services, Inc. ("United

Water")[1] and two high-ranking managers at its former Gary operation, its former Project

_____

[1] Since the Indictment was returned, United Water Services, Inc. underwent a name
change to United Water Environmental Services, Inc. The parties have stipulated that
they are the same corporation. DE 79.

1

Manager, Dwain L. Bowie, and its former Superintendent, Gregory A. Ciaccio, with conspiracy and Clean Water Act violations arising out of their scheme to manipulate chlorine disinfection levels in advance of taking the daily grab sample to test for *E. coli* violations.  Beginning in 2003, at a time when United Water's operation of the Gary Sanitary District Waste Water Treatment Plant was resulting in a number of *E. coli* violations and when United Water's expenses to run the Gary treatment plan were exceeding the income it derived from the operation, Bowie implemented a scheme to boost the amount of chlorine used in advance of taking the *E. coli* sample and then decrease the chlorine after the sample had been taken.  Shortly thereafter, Ciaccio joined United Water and became an active participant in the scheme.  This scheme continued until Special Agents from the U.S. Environmental Protection Agency and the Federal Bureau of Investigation executed a search warrant on October 20, 2008.

Based on this conduct, a federal grand jury sitting in the Northern District of Indiana returned an Indictment on December 8, 2010, against United Water, Bowie, and Ciaccio.  Count one of the Indictment charges all three Defendants with engaging in a conspiracy that had two illegal objects:  1) to tamper with a monitoring method required under the Clean Water Act and 2) to defraud the United States by hampering, hindering, impeding, impairing, and obstructing the lawful and legitimate functions of the U.S. EPA, both in violation of 18 U.S.C. § 371.  The Indictment sets forth numerous overt acts in furtherance of the conspiracy.

Count two charges United Water and Bowie with knowingly tampering with a monitoring method required to be maintained under the Clean Water Act, by temporarily

increasing the concentration of chlorine before taking the *E. coli* compliance sample, and then decreasing it after the sample had been taken. Counts three through twenty-six allege that all three Defendants – United Water, Bowie, and Ciaccio – tampered with a monitoring method in the same manner, in violation of 33 U.S.C. § 1319(c)(4).

### B. Summary of the Conduct

In 2001 through early 2003, United Water was experiencing and reporting as required *E. coli* violations it discovered as a result of the taking of the required daily *E. coli* sample. United Water pressured its management at the Gary facility to stop the *E. coli* violations. (Bowie arrived at the Gary facility as Project Manager in October 2002; Ciaccio arrived in August 2003). The multiple *E. coli* violations continued through May 2003, with one in April and three in May.

In about May 2003, Bowie approached United Water's then-superintendent of the Gary plant, Employee H in the Indictment, and directed him to turn up the chlorine before taking the *E. coli* sample and turn it down afterward. Employee H refused to comply with Bowie's order, telling Bowie he did not want to go to jail. Shortly after this, Bowie fired Employee H and handed him a separation agreement that Bowie already had signed, which included payment of one year's salary. Employee H ultimately agreed to a modified version of the separation agreement.

Bowie found other United Water employees at the Gary plant to comply with his orders. However, in June 2003, United Water brought in an employee from another of its operations to provide advice about how to run the Gary plant. This employee learned about the chlorine boosting and lowering scheme, and brought it to the attention of his

boss.  Both concurred that it was wrong for United Water personnel at the Gary treatment plant to be turning up the chlorine prior to taking the sample and then lowering it after. When confronted about the scheme, Bowie explained that it was a one-time occurrence and would not happen again.  It did not stop.  Rather, the chlorine boosting scheme continued as charged.

United Water operators and supervisors at the Gary plant are expected to testify that they were ordered by Bowie and Ciaccio to boost the chlorine prior to taking the *E. coli* sample and to lower it afterward.  On many days this involved boosting the chlorine first thing in the morning, taking the sample, and immediately lowering it.  On some days, it took many hours to achieve a sufficient concentration of chlorine for the level to be deemed acceptable, and the *E. coli* sample was delayed until mid to late afternoon as a consequence.  After the sample was taken, like the other days, the chlorine was reduced. Gregory Ciaccio was regularly involved in giving the instructions to raise and lower the chlorine.

In addition, laboratory personnel who were responsible for physically taking the daily *E. coli* grab sample will testify that they did not choose when to take the sample. Instead, that decision was made by United Water employees working in plant operations. Once the free chlorine residual was high enough, the operators or their supervisors would drive a vehicle to the on-site lab, pick them up and drive them to the chlorine contact chamber to take the sample, and return them to the lab after the sample was taken.

This testimony is bolstered and supported by United Water records.  The chlorine log book, operation logs, daily operating reports, and other operational documents show

4

that chlorine dosing was boosted early in the morning before the laboratory personnel arrived. Once the chlorine concentration was boosted high enough that they believed an *E. coli* kill could be achieved and the lab staff was in, the lab staff would be picked up to take the daily *E. coli* sample for testing. After the *E. coli* sample was taken – be it 8a.m., 10a.m., or 6:30p.m. – the chlorine was turned back down.

## II.    SUMMARY OF THE APPLICABLE LAW

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under the National Pollutant Discharge Elimination System (NPDES) program, anyone who discharges a pollutant into a water of the United States, such as the Gary treatment plant, is required to operate under a NPDES (or discharge) permit to do so. A discharge permit typically authorizes the discharge of only certain pollutants within maximum limits set forth in the permit. The facility operator is required to monitor its discharge and self report any violations of the permit. The Act does not envision that the government will perform the daily monitoring or taking of samples for holders of NPDES permits. Instead the burden is on the discharger of pollutants to take samples as called for in the permit in order to determine whether discharges comply with the permit's limits and to report when the discharges violate the permit. *See Sierra Club v. Union Oil Co.,* 813 F.2d 1480, 1492 (9th Cir. 1987), *vacated on other grounds*, 485 U.S. 931 (1988). As such, the system places a great deal of faith and trust in the honesty and fair play of those in charge of facilities that discharge into the Nation's waters. *Id.*

When someone knowingly meddles with the system, as Defendants did, they undermine the entire program. The reliance on the integrity of the regulated community to follow the rules is a basic tenet of the system. Indeed, in establishing a system of self reporting, Congress recognized that the government does not have the resources to regularly collect samples from all who discharge pollutants into the Nation's waters and sewers, including large treatment facilities such as the Gary Sanitary District which discharges tens of millions of gallons into the Grand Calumet River every day.

### A.   COUNT ONE:  Conspiracy, 18 U.S.C. § 371

Count one of the Indictment charges a violation of 18 U.S.C. § 371 (conspiracy). That statute provides, in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be . . . [guilty of an offense against the United States].

18 U.S.C. § 371.

The elements of a conspiracy violation are:

1.    The conspiracy as charged in the Indictment existed;

2.    The defendant knowingly became a member of the conspiracy with an intention to further the conspiracy; and

3.    At least one overt act was committed by at least one conspirator in furtherance of the conspiracy.

18 U.S.C. § 371; Seventh Circuit Criminal Jury Instruction 5.08; *United States v.*

*Sanchez*, 615 F.3d 836, 842 (7th Cir. 2010).  The conspiracy charged in the Indictment

alleges that Defendants conspired to violate the Clean Water Act and to "defraud" the United States; that is, to interfere with or obstruct a lawful government function.  *United States v. F.J. Vollmer & Co., Inc.*, 1 F.3d 1511, 1519 (7th Cir. 1993).  Count one alleges a conspiracy spanning six years.

Here, the United States will prove that Defendants agreed to tamper with the monitoring method by increasing chlorine used to kill *E. coli* before taking the sample and then decreasing it after.  They did this knowing that the once-per-day required grab sample was taken so that testing could be conducted at the in-house laboratory to determine if the treatment plant was discharging more than the allowed *E. coli*, as had been occurring prior to the conspiracy starting.  If a violation was found, it would have to be reported to the EPA or its state delegate, the Indiana Department of Environmental Management.

Dwain Bowie directed others within the United Water organization to engage in this conduct.  Various other United Water employees participated in this conduct, in accordance with what Bowie wanted.  When Gregory Ciaccio arrived at United Water's Gary operation, he joined the conspiracy and took a leading role, directing others to raise and lower the chlorine levels to correspond with the taking of the *E. coli* sample.

## B.  COUNTS TWO – TWENTY-SIX: Clean Water Act, 33 U.S.C. § 1319(c)(4)

Count two of the Indictment charges United Water and Bowie, and three through twenty-six charge United Water, Bowie and Ciaccio, with violating of 33 U.S.C. § 1319(c)(4) of the Clean Water Act.  This statute provides in pertinent part:

> Any person . . . who knowingly . . . tampers with . . . any monitoring . . . method required to be maintained under this chapter . . . [shall be guilty of an offense against the United States].

18 U.S.C. § 1319(c)(4).

To establish a violation of 18 U.S.C. § 1319(c)(4), the United States must prove:

1.    The defendant;

2.    Tampered with a monitoring method;

3.    The method was required to be maintained under the Clean Water Act; and

4.    The person acted knowingly.

33 U.S.C. § 1319(c)(4). Defendants tampered with the monitoring at the Gary Sanitary District waste water treatment plant when they knowingly altered chlorine dosing in advance of the sampling time for the purpose of influencing the *E. coli* test sample and decreased it after.

## III.    JURY INSTRUCTIONS

On October 3, 2012, the government provided Defendants with a set of draft jury instructions. The parties have conferred and have reached agreement on some but not all of the instructions. Communication is ongoing regarding the jury instructions.

## IV.    STIPULATIONS

The parties are in the process of exchanging proposed stipulations on a number of issues. So far, the government has proposed and Defendants have agreed to the following stipulations: (1) the NPDES permits in effect during the term in the Indictment; (2) name

changes of United Water; and (3) IDEM was authorized by U.S. EPA to operate the

Clean Water Act in Indiana.

## V.   OUTSTANDING MOTIONS

The following motions have been filed and joined:

1. Defendants' Motion to Exclude Testimony of Expert Witness Michael Kuss, DE 113, DE 115, DE 125, DE 130;

2. Government Motion to Limit Testimony of Defendants' Expert Witnesses Charles Hurst and George Tchobanoglous, DE 136, DE 139, DE 148;

3. Defendants' Motion to Exclude Testimony of Expert Witnesses Trent Rainey and David Jenkins, DE 117, DE 119, DE 126, DE 131;

4. Defendants' Motion *in Limine* to Exclude Co-defendant Statements, DE 149, DE 150, DE 166, DE 174;

5. Defendants' Motion for Case-Specific Jury Questionnaire, DE 152, DE 165, DE 172;

6. Defendants' Motion for Additional Peremptory Challenges, DE 153, DE 164, DE 173;

7. Defendants' Motion for Attorney-Conducted Voir Dire, DE 154, DE 162;

8. Defendants' Motion Requesting Telephonic Status Conference Regarding Jury Selection Procedures, DE 155, 163.

9. Defendants' Motion *in Limine* to Exclude Evidence, DE 224, DE 231;

10. Defendants' Motion *in Limine* to Allow Admission of Evidence Relating to Indiana's Adoption of the Ten Percent Rule, DE 221, DE 230;

11. United States' Motion *in Limine* to Exclude Irrelevant Evidence, DE 222, DE 229;

12. Defendants' Supplement to Motion Requesting Status Conference Regarding Jury Selection Process, DE 225 (not joined).

## VI.    EVIDENTIARY ISSUES

### A.    Exhibits

The United States provided Defendants with an updated exhibit list on October 12, 2012, and will be filing its exhibit list on October 24, 2012.  These exhibits have been marked, and paper and electronic copies will be provided to the Court and Defendants prior to trial.

### B.    Admissibility of Business Records Under Fed. R. Evid. 803(6)

The United States intends to move for the admission of business records during its case-in-chief.  These documents include: (1) United Water records related to operation of the chlorine disinfection system at the Gary treatment plant, including chlorine log books, daily operating reports, and operations logs; (2) United Water communications concerning the sampling for operation of the Gary plant including chain of custody sheets, memoranda, and emails; and (3) the NPDES permits issued to the Gary Sanitary District.  Most of these records were produced by United Water to the government during the course of the investigation.  Some were seized by the government during the execution of a search warrant.  Almost all of the documents the government seeks to introduce at trial were created by Defendants Bowie or Ciaccio, or other United Water employees during the course of their employment and during the conspiracy period.

It is the government's understanding that United Water's business records conform to the elements of the hearsay exception of Rule 803(6) of the Federal Rules of Evidence ("Fed. R. Evid."), namely that these records:

(1)  were prepared in the normal course of business;

(2)  were made at or near the time of the events they record; and

(3)  were based on the personal knowledge of the entrant or on the personal

knowledge    of an informant having a business duty to transmit the information to the

entrant. *Datamatic Services, Inc. v. United States,* 909 F.2d 1029, 1032 (7th Cir. 1990).

Defendants do not object to the authenticity of most, although not all, of these

United Water documents.  They also have agreed to the admissibility of a number of

documents.  The rationale behind the business records exception is that such documents

have a high degree of reliability because businesses have incentives to keep accurate

records.  Many of the documents the government will seek to introduce involve United

Water's operation of the Gary treatment plant and are between Defendants, and other

United Water employees concerning United Water business practices at the Gary plant,

including chlorination and sampling practices.

As a condition precedent to the admission of evidence, the proponent of that

evidence must satisfy the requirements for authentication under Federal Rule of Evidence

901.  The "minimal" requirement of authentication requires that the United States

introduce "evidence sufficient to support a finding that the matter in question is what [the

United States] claims."  *United States v. Meienberg*, 263 F.3d 1177, 1181 (10th Cir.

2001); *see also* Fed. R. Evid. 901(a); *United States v. Pang*, 362 F.3d 1187, 1192-93 (9th

Cir. 2004).  It is not necessary that the person who made the actual entry into the business

records testifies about how the records were generated.  Rather, the only requirement is

that it is someone who "understands the system" for creating the records.  *United States v.*

*Keplinger*, 776 F.2d 678, 694 (7th Cir. 1985); *see also United States v. Armstrong,* 619

F.3d 380, 385 (5th Cir. 2010); *United States v. Franco*, 874 F.2d 1136, 1137-39 (7th Cir.

1989).  Business records, not created for the purpose of litigation, are non-testimonial and

thus do not raise Confrontation Clause concerns.  U*nited States v. Mashek*, 606 F.3d 922,

930 (8th Cir. 2010).

### C. Defendants' Statements

Dwain Bowie and Gregory Ciaccio both made statements to Special Agents of the

EPA and FBI in connection with this case.  At trial, the United States may offer portions

of one or both of these statements in its case-in-chief as non-hearsay statements of an

opposing party under Rule 801(d)(2).  *See* Fed. R. Evid. 801(d)(2) (defining as non-

hearsay a statement of an opposing party provided the statement is offered against a

party).

Out-of-court statements made by a defendant are not hearsay when they are

offered by the prosecution.  Fed. R. Evid. 801(d)(2); *United States v. Spiller*, 261 F.3d

683, 690 (7th Cir. 2001) ("A party's own statements offered against him are considered

admissions by a party-opponent, and, as such, are not hearsay and are admissible under

Fed. R. Evid. 801(d)(2)(A).").  However, if those same statements are offered by the

defense, they constitute inadmissible hearsay.  *See United States v. Haddad*, 10 F.3d

1252, 1258 (7th Cir. 1993) (noting that "a defendant's self-serving, exculpatory, out of

court statements" are generally inadmissible).  Moreover, under Rule 801(d)(2),

defendants are generally prevented from introducing other portions of those same

statements.

The court in *United States v. Petraia Maritime, Ltd.*, 489 F.Supp. 2d 90, 95 (D. Me 2007), held that statements made by crew members to the Coast Guard during the boarding constituted admissions against the vessel's corporate owner and operator covered by Fed. R. Evid. 801(d)(2)(D) and further determined that because such admissions of the defendant are defined as "not hearsay," their admission, even for the truth, did not violate the Confrontation Clause. *Petraia*, 489 F. Supp. 2d at 95 n.9; *see also Crawford v. Washington*, 541 U.S. 36, 60 (2004) .

The United States does not anticipate any significant *Bruton* issues in introducing the statements of Bowie and Ciaccio. *Bruton v. United States*, 391 U.S. 123 (1968), stands for the proposition that a statement made by a defendant about his co-defendant's actions or admissions are inadmissible unless the defendant making the statement testifies. The inadmissibility of those statements is based not on hearsay concerns, but rather on concerns premised on the Confrontation Clause. *Id.* at 134-36. The practical effect of *Bruton* in this case is limited. The United States is aware of only one statement by Bowie about Ciaccio that may raise the possibility of a *Bruton* issue. In his statement to Special Agents of the EPA and FBI, as reported in the interview report Dwain Bowie said that he, Bowie, "is the manager but never turns a valve in the plant. Bowie simply reviews all the relevant reporting and then tells Ciaccio what adjustments need to be made. Bowie stated he relies on Ciaccio and others that report to him." In its case-in-chief, the United States will simply replace the first reference to Ciaccio with "someone." The next sentence the words "Ciaccio and" will be deleted. However, should Bowie testify during the trial, the United States may then question him regarding his statements

13

about Ciaccio.  Such testimony is not prohibited by *Bruton* because Bowie will then be a witness subject to cross-examination by Ciaccio's attorneys. *See Nelson v. O'Neil*, 402 U.S. 622 (1971).

### D.    Admission under the Hearsay Rules

#### 1.    Non-hearsay

The United States also will establish that certain documents and other out-of-court statements are not excluded from admission by the hearsay rules.  Many of the out-of-court statements that the United States will offer, both through testimony and documents, do not implicate the hearsay rules because the relevance of those statements does not depend on the literal truth of the words.  Rather, the words are "verbal acts" of the conspirators and their agents and not hearsay.  The Supreme Court recognized this theory in *Lutwak v. United States*, 344 U.S. 604, 617 (1953) and *Anderson v. United States*, 417 U.S. 211, 212-21 (1974), where the false statements were properly admissible against all conspirators to prove the existence of the conspiracy.

"Statements by coconspirators are commonly introduced at trial simply because the statements themselves are part of the plotting to commit a crime.  The coconspirator is not asserting the truth of a historical event."  *United States v. Faulkner*, 439 F.3d 1221, 1226 (10th Cir. 2006).  The *Faulkner* court went on to state that verbal acts or part thereof in which "the statement itself affects the legal rights of the parties or is a circumstance affecting their rights" is not hearsay.  *Id.*

In this case, many of the Defendants' statements, as well as those of coconspirators, relating to the boosting and lowering of the chlorine levels to take the *E.*

*coli* samples are such verbal acts.  The same reasoning applies to the statements  of the agents of the conspirators who are authorized to act on behalf of the company or the conspirators under *United States v. Krohn*, 573 F.2d 1382, 1386 (10th Cir. 1978) and *United States v. Amrep Corp.*, 560 F.2d 539, 545 (2d Cir. 1977).  Thus, a command to do something is not hearsay because it is not an assertion of fact.  *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011); *Crawford v. Garnier*, 719 F.2d 1317, 1323-24 (7th Cir. 1983).

### 2.      Adopted Non-Hearsay

As an alternate to admissibility, the United States may also seek to admit documents as adopted non-hearsay.  The Advisory Committee Notes to Rule 801 point out that "when a witness, on the stand and under oath, acknowledges that a prior statement is his own statement and is truthful, the witness adopts the prior statement as his present testimony and there is no hearsay problem."  Fed. R. Evid. 801; s*ee also United States v. Lopez-Lopez*, 282 F.3d 1, 17 (1st Cir. 2002); *Amarin Plastics, Inc. v. Maryland Cup Corp.*, 946 F.2d 147, 153 (1st Cir. 1991); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1274 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005); *United States v. Klein*, 488 F.2d 481, 483 (2d Cir. 1973); *BCCI Holdings Societe Anonyme v. Khalil*, 184 F.R.D. 3, 6-7 (D.D.C. 1999).

### 3.      Statement of a Party Opponent

At trial, the government may also seek introduce certain statements made by employees of United Water that the government believes are true.  These include

statements made by certain employees during the conspiracy describing adjustments made to the chlorine concentration prior to and after taking of *E. coli* samples.

Because these statements were made concerning matters within the scope of the their employment and were made during the existence of the employer-employee relationship, they are non-hearsay statements admissible against Defendant United Water as statements of a party opponent pursuant to Rule 801(d)(2)(D) of the Federal Rules of Evidence.  Further, for some of the employees, the statements also were non-hearsay co-conspirator statements under Rule 801(d)(2)(E).

### E.    Character Evidence

#### 1.    Overview

The United States anticipates that Defendants might offer character evidence at trial, attempting to introduce evidence of the bad character of one or more government witnesses or of the good character of Defendants, or both.  The admissibility of character evidence is governed by Rules 401 (Relevant Evidence), 403 (Exclusion of Relevant Evidence on Grounds of Prejudice), 404 (Character Evidence Not Admissible to Prove Conduct), 405 (Method of Proving Character Evidence), and 608 (Evidence of Character and Conduct of Witness).  Character evidence, like all other forms of evidence, must be relevant in order to be admissible.  Fed. R. Evid. 401.  Moreover, this type of evidence, like all other evidence, is subject to the balancing test of Rule 403, which requires exclusion if the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

### 2.    Evidence of the Defendants' "Good Conduct"

Evidence of "good" and "honorable" behavior by a defendant generally is not admissible at trial. If Defendants Bowie or Ciaccio wish to introduce evidence of "good conduct," such evidence is admissible only if it comports with the requirements of Fed. R. Evid. 404 and 405. Those rules provide the following limitations to "good conduct" evidence: (1) during direct examination, a witness may provide only reputation or opinion testimony regarding "pertinent" character traits; (2) during cross-examination by the United States, the witness may be questioned regarding his or her knowledge of relevant specific instances of a defendant's past conduct; and (3) following admission of character evidence by the defense, the United States is permitted to call its own rebuttal witnesses. *See* Fed. R. Evid. 404 and 405. Each of these limitations is addressed in turn below.

First, generally speaking, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Pursuant to Rule 404(a)(2)(A), one of the limited exceptions to that rule is evidence that is offered by an accused in a criminal case regarding his own "pertinent" character trait. This type of testimony must relate to a particular issue in the case, and the witness may testify only about the character trait relevant to that issue. For example, in a fraud case, a character witness may testify about the defendant's reputation for honesty, but in a controlled substance case, the same

testimony would be excluded.  *See United States v. Jackson*, 588 F.2d 1046, 1055 (5th

Cir. 1979).  If a court determines that particular character evidence is "pertinent" and

therefore admissible, the form and method of its proof are governed by Rule 405.  *See*

Fed. R. Evid. 405, Advisory Committee Notes, 1972 Proposed Rules (Rule 404 deals

with admissibility, whereas Rule 405 deals with allowable methods of proof).  Under

Rule 405, Defendants' character witnesses must be restricted to testifying about their

opinion of the relevant character traits or their knowledge of defendants' reputation in

that regard.  These witnesses may not testify about specific instances of conduct on direct

examination.  Fed. R. Evid. 405(a), 608(b); *Michelson v. United States*, 335 U.S. 469,

477 (1948).

Second, once a witness has testified about a defendant's "good" character, Rule

405(a) allows the United States to cross-examine the defendant's character witnesses to

determine whether they have heard of or know about specific instances of conduct

indicating contrary tendencies.  Cross-examination of a character witness may even

include inquiries which are not otherwise allowed.  For example, it is generally

impermissible to introduce extrinsic evidence or cross-examine a defendant about

whether he has been arrested for or committed past misdeeds unrelated to the charged

offense.  Nonetheless, if a character witness testifies for a defendant, the cross-

examination may include inquiry about the defendant's past crimes, wrongful acts, and

arrests.  *Michelson*, 335 U.S. at 482-83.  Thus, if a defendant offers evidence of his

character trait for law abiding behavior, he may not offer specific instances of conduct

(for example, evidence of good deeds he did while in the Boy Scouts).  *United States v.*

18

*Morgan,* 554 F.2d 31, 33 (2d Cir. 1977).  On cross-examination, however, the United

States may question that witness about specific acts of the defendant's non-law-abiding

behavior (for example, evidence of underage drinking or driving without a license).  *Id.*

The United States may also ask the witness about the facts of the case for which the

defendant is on trial, but may not ask the witness to assume the defendant's guilt in the

case.  *United States v. Polsinelli*, 649 F.2d 793, 795 (10th Cir. 1981).

Under the foregoing principles, Defendants in this case may not introduce

evidence of their generally good character -- e.g., that they are "good honorable

managers."  Nor can they put on evidence of specific acts of good conduct, such as

instances where they did not tamper with a monitoring method.  In addition, the

defendants may not offer evidence (either through government witnesses or their own

witnesses) about specific awards they may have received or other notable achievements.

*United States v. Boylan*, 898 F.2d 230, 255 (1st Cir. 1990) (excluding evidence of police

commendations under Rule 405); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir.

1989) (evidence of bravery, attention to duty and community spirit "hardly 'pertinent'" to

mail fraud and perjury charges); *United States v. Barry*, 814 F.2d 1400, 1403 (9th Cir.

1987) ("letters of commendation were hearsay").  Rule 608, which permits the use of

certain character evidence if that evidence relates to truthfulness, does not dictate a

different result.

### F.     Evidence, Argument, Questioning or Commentary Concerning Potential Penalties Faced by Defendants

The Court should preclude Defendants from introducing evidence of, making argument, or otherwise commenting on the potential penalties Defendants face if convicted.  The Seventh Circuit has unequivocally held that "arguing punishment to a jury is taboo."  *See, e.g., United States v. Richardson*, 130 F.3d 765, 778 (7th Cir. 1997); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997).  The reason for this black letter rule is that evidence or argument concerning punishment is irrelevant to the jury's determination of guilt or innocence.  *See Shannon v. United States*, 512 U.S. 573, 579 (1994).  Mention of potential penalties faced by Defendants would serve only the improper purpose of jury nullification, and should be disallowed.  *See id.*

### G.     Evidence, Argument, Questioning or Commentary Concerning Allegations Against the Government's Investigation

There is an "increasing tendency in criminal cases to try some person other than the defendant and some issues other than his guilt."  *United States v. Griffin*, 867 F. Supp. 1347, 1347 (N.D. Ill. 1994) (citation omitted).  The thrust of the defense in such a case "is this: the prosecution was not nice or could have done it better and so the jury ought to acquit, whether or not guilt has been proved beyond a reasonable doubt."  *Id.* at 1347.  In response to this increasing tendency to interject themes of "government misconduct" into a defense strategy, courts have barred "defendants from presenting evidence or making arguments to the jury suggesting that they should be acquitted because the government engaged in misconduct in the course of its investigation."  *See, e.g., United States v. Finley*, 708 F. Supp. 906, 913-14 (N.D. Ill. 1989) (granting motion *in limine* to preclude

evidence "which is not relevant to defendants' guilt but is designed only to persuade the jury that defendants should be acquitted because the government engaged in misconduct during its investigation.").

The Seventh Circuit has rejected the outrageous government conduct defense and has held that such claims afford no defense to a criminal prosecution as a matter of law. *See United States v. Boyd*, 55 F.3d 239, 241-42 (7th Cir. 1995); *see also United States v. Sherman*, 268 F.3d 539, 549 (7th Cir. 2001) ("[W]e of course have held that the defense of outrageous government conduct does not exist in this circuit . . . ."). *Boyd* is unequivocal in its holding that "outrageous government conduct" is no defense to a criminal charge, and the jury thus should not be exposed to irrelevant allegations of this sort. Accordingly, Defendants should be precluded from attempting to defend this case by attacking the propriety of the government's investigation.

### H.      Regulatory Witness Testimony Regarding the Clean Water Act

Juries typically begin cases with little understanding about the operation of the Clean Water Act and its regulations, and how the permitting and self-monitoring system works. The United States has given notice to the defense of its intention to call a former inspector with the Indiana Department of Environmental Management to explain basic steps in the regulatory process in order for the jury to be able to follow subsequent testimony about what did and did not occur. The admission of this testimony is the subject of a pending motion.

As discussed in detail in the United States' response to the motion *in limine*, this testimony is admissible. In *United States v. Lewis*, 240 F.3d, 866, 869-70 (10th Cir.

2001), the defendant was convicted for commercial wildlife hunting violations. On appeal, the court upheld testimony by a law enforcement official who was asked to describe the basic requirements for acquiring an Oklahoma commercial hunting license. The witness described the requirements, but said nothing about whether the defendant violated the law at issue, or otherwise offered a legal opinion, as the district court had instructed. *Id.*

This Court has broad authority under Rule 702 to admit such testimony. *United States v. Tapia-Ortiz*, 23 F.3d 738, 740 (2d Cir. 1994). When the district court is satisfied that knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue, such testimony is admissible. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *United States v. Dukagjini*, 326 F.3d 45, 51 (2d Cir. 2003).

## I.        Impeachment by Prior Convictions

Rule 609, Fed. R. Evid., governs the admissibility of prior criminal convictions to impeach a witness's character for truthfulness. Rule 609(a)(1) governs crimes that are punishable by death or by imprisonment for more than one year. *See Clarett v. Roberts*, 657 F.3d 664, 669 n.2 (7th Cir. 2011). Rule 609(a)(2) applies to any crimes, regardless of punishment, where the elements of the crime require proving a dishonest act or false statement. *Id.* Crimes which do not fit either of these two categories are not admissible to impeach a witness. *Id.* A further limitation on the use of prior criminal convictions is found in Rule 609(b), which limits the admissibility of a conviction if more than 10 years have passed since the conviction or release from confinement – the probative value of the

conviction must substantially outweigh its prejudicial effect, and the proponent gives reasonable written notice of the intent to use the conviction.

Certain witnesses whom the United States anticipates calling to testify at trial have criminal histories. Specifically, the following witnesses have prior convictions, as noted below:

1  Witness J.C.-1:

   -1968 - failure to appear; parking against traffic – Scottsbluff, Nebraska

2  Witness J.C.-2:

   -2003 - Disregard traffic control device - Indiana
   -1973 - Loitering - inv narcotics - Gary, Indiana

3  Witness A.G.:

   -2012 - Driving while suspended - Indiana
   -2009 - Improper turn at intersection - Indiana
   -2006 -  Speeding - Indiana

3  Witness M.K.:

   -2004 - Speeding - Indiana
   -2003 - Seat belt violation - Indiana
   -2002 - Speeding - Indiana
   -1979 - Trespassing to property - Wisconsin

4  Witness H.G.:

   -1972 - Inv Poss Narc -  Gary, Indiana

5  Witness K.W.:

   -2012 - Operating vehicle without financial responsibility - Indiana
   -2012 - Driving while suspended - Indiana
   -2012 - No brake or turn signal - Indiana
   -2011 - Non-motor vehicle violation – Indiana

Based on a review of the criminal histories, none of the convictions noted above should be admitted at trial.  First, none of the convictions appear to be punishable by death or by imprisonment for more than one year, as set forth in Rule 609(a)(1), and thus are not admissible under that provision.  Neither do any of the convictions involve a dishonest act or false statement as an element of proving the crime, as required by Rule 609(a)(2).  Lastly, several of the convictions are outside the 10-year time limit set forth in Rule 609(b), and there are no specific facts or circumstances that would make any of those convictions substantially more probative than prejudicial.

### J.        Summary Exhibit

Rule 1006 of the Federal Rules of Evidence allows the use of "a summary [or] chart . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  The documents that will serve as the basis for the government's summary chart have been produced to Defendants, are marked as Government Exhibits, and an exhibit list with the documents has been produced to Defendants.

The United States anticipates that an agent will testify about the summary chart and be available for cross examination.  The Court may exercise its discretion and admit the chart as evidence.  *See United States v. Swanquist*, 161 F.3d 1064, 1072-73 (7th Cir. 1998; *United States v. Doerr,* 886 F.2d 944, 958 (7th Cir. 1989).

## CONCLUSION

WHEREFORE, the United States respectfully submits its Trial Brief to assist the

Court in the above-captioned matter.


                            Respectfully submitted,

                            DAVID A. CAPP
                            UNITED STATES ATTORNEY

By:     s/ Toi Denise Houston
           Toi Denise Houston
           Assistant United States Attorney

           s/ Krishna S. Dighe
           Krishna S. Dighe
           Assistant Chief
           Environmental Crimes Section
           U.S. Department of Justice

           s/ Leslie Lehnert
           Leslie Lehnert
           Trial Attorney
           Environmental Crimes Section

           s/ David P. Mucha
           David P. Mucha
           Special Assistant United States Attorney

# *Certificate of Service*

I hereby certify that on October 19, 2012 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

- **Jackie M Bennett , Jr**
  jbennett@taftlaw.com,docket@taftlaw.com,kdevalal@taftlaw.com,kjacob@taftlaw.com
- **Harold R Bickham**
  hbickham@btlaw.com,dmaher@btlaw.com
- **Robert R Clark**
  rclark@taftlaw.com
- **Patrick J Cotter**
  patrick.cotter@btlaw.com
- **Robert A Gerber PHV**
  robert.gerber@unitedwater.com
- **Abram B Gregory**
  agregory@taftlaw.com,rryan@taftlaw.com,docket@taftlaw.com
- **Timothy A Haley**
  thaley@btlaw.com
- **James P Hanlon**
  jphanlon@faegrebd.com,deb.workman@faegrebd.com
- **George E Horn , Jr**
  george.horn@btlaw.com
- **Kevin M Kimmerling**
  kevin.kimmerling@FaegreBD.com,pamela.pope@Faegrebd.com
- **Larry A Mackey**
  Larry.Mackey@btlaw.com
- **Meredith A Rieger PHV**
  mrieger@btlaw.com
- **Steven P Solow PHV**
  steve.solow@kattenlaw.com,kristine.rembach@kattenlaw.com
- **Dennis P Stolle**
  dennis.stolle@btlaw.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

**None**

/s/ *Gloria Powell*
Gloria Powell
Legal Assistant